UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE DAVIDSON,

     Plaintiff,       Case No. 09-11308

               Paul D. Borman
v.               United States District Judge

ALLSTEEL, INC., an Illinois
Corporation, and JAMIE MAY,
an individual, jointly and severally.

       Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 12) AND DISMISSING PLAINTIFF'S COMPLAINT

  This matter is before the Court on Defendants Allsteel, Inc. and Jamie May's Motion for

Summary Judgment.  (Dkt. No. 12.)  Plaintiff filed a response (Dkt. No. 19) and Defendants filed

a reply (Dkt. No. 20).  The Court held a hearing on January 20, 2011.  For the reasons that follow,

the Court GRANTS Defendants' motion for summary judgment and DISMISSES Plaintiff's

Complaint.

**INTRODUCTION**

  Plaintiff claims that her direct supervisor at Defendant Allsteel, Inc. ("Allsteel"), Mr. Jamie

May ("May"), disliked working with women and recommended her termination based on her gender.

Plaintiff also alleges that she complained about May's discriminatory treatment and was terminated

in retaliation for her complaints. Defendants respond that May, who was not ultimately responsible

for Plaintiff's termination, harbored no discriminatory animus toward her and that Plaintiff was

terminated because of poor performance and for her part in losing and failing to regain the trust and confidence of Allsteel's largest dealer in the Detroit market. Defendants also respond that none of the individuals ultimately responsible for Plaintiff's termination were aware that she had complained that May had treated her inappropriately based on her gender and therefore could not have fired her in retaliation for the alleged complaints.

## I.    FACTUAL BACKGROUND

Allsteel, part of the HNI Corporation, is a furniture manufacturer headquartered in Muscatine, Iowa. (Defs.' Mot. Ex. 3.) Allsteel does not sell the furniture which it manufactures directly to customers but rather sells its products exclusively through dealers. (Defs.' Mot. Ex. 16, Pl.'s Resp. Ex. 19, Deposition of Michelle Davidson, October 16 and November 9, 2009, p. 39.) Plaintiff began working for Allsteel as a Business Development Manager ("BDM") in the Detroit market in 2004, with the responsibility to "develop new business, call on end users, architects, designers, real estate, build brand awareness, do lunch and learns, plan events, work with salespeople . . . to move the process along with sales." (Davidson Dep. 25, 28-29, 42.) From 2004-2006 Plaintiff worked as a BDM in the Detroit market, dealing almost exclusively with Allsteel's largest dealer in that market, Interior Environments ("IE"). (Davidson Dep. 38-39; Defs.' Mot. Ex. 19, Pl.'s Resp. Ex. 22, Deposition of Stephen J. Westog, March 24, 2010, p. 52.) Plaintiff shared the Detroit market with another BDM, Christine Harvey. Both were exclusively responsible for the IE account, working toward the same sales goal and both receiving compensation on that collective goal. (Davidson Dep. 42-44.) Sometime in 2006, Plaintiff was promoted to corporate accounts, where she worked to develop new business with Fortune 500 companies and to increase business with existing accounts. (Davidson Dep. 39-40, 46.) During this time frame, Plaintiff received good

reviews from her supervisors, Doug Farley and Brandon Sieben, both of whom indicated that Plaintiff met or exceeded company expectations in most categories. (Pl.'s Resp. Ex. 1.)

In 2007, Plaintiff requested a transfer to marketing because she "wasn't enjoying the position at corporate accounts and [her] manager was leaving to move to marketing." (Davidson Dep. 46.) Plaintiff was not offered a position in marketing. However, since her old position as a BDM in the Detroit market had never been filled, she ultimately left corporate accounts to return as a BDM in the Detroit market, again responsible for the IE account which remained the largest Allsteel dealer in that market. In addition to IE, Plaintiff was also now responsible for a second, smaller Alsteel dealer, Corporate Express ("CE"). (Davidson Dep. 46, 58.) Prior to accepting her old BDM position, Plaintiff discussed the move with several people, including the two principals of IE, Randy Balconi and Steve Cojei, as well as with May, who was then the regional manager of the Ohio Valley region and would be Plaintiff's direct supervisor. (Davidson Dep. 50-52.) In her discussions with May prior to returning to her BDM position, May never indicated to Plaintiff that he did not want her on his team. (Davidson Dep. 56-57.) Further, although the corporate accounts position was a higher salaried position, Plaintiff did not receive a pay cut when she transferred back to her BDM position. (Davidson Dep. 57.) As in the past, Plaintiff shared the Detroit market with another BDM, this time a male colleague, Dan Pembroke. As with Plaintiff's former BDM partner, Christine Harvey, Plaintiff and Pembroke worked together toward a team goal and received commissions on all sales made by them as a team, regardless of who developed the project. (Davidson Dep. 59-60.)

Plaintiff returned to her BDM position in approximately April 2007, and she and Pembroke had a team goal of approximately $11 million of Alsteel product to be sold in the Detroit market

through IE and CE in 2008 (the goal had been something slightly less than that for 2007).  (Davidson

Dep. 59-60.)  As BDMs, both Plaintiff and Pembroke were required to input sales opportunities in

a program called Sales Logix and to keep track of potential business, represented by projects in

various stages of development and with varying prospects for closure.  These project opportunities

are referred to as the BDM's "funnel."  (Davidson Dep. 76-77; Defs.' Mot. Ex. 18, Pl.'s Resp. Ex.

20, Deposition of Jamie May, January 21, 2010, pp. 82-84.)  Each BDM's funnel was supposed to

be some multiple of the team sales goal, anywhere from three to five times the team goal, with the

expectation that a portion of the opportunity represented by the funnel would never be realized.

(Davidson Dep. 78.)

At some point prior to October, 2007, Plaintiff was asked to plan and organize a Halloween

party for Allsteel and IE, an event which Plaintiff had planned for a prior employer, and also had

planned for Allsteel and IE in 2005, during her previous time working as a BDM.  (Davidson Dep.

61-65.)  Plaintiff spent a significant amount time planning the party but on neither occasion, in 2005

or 2007, were Plaintiff's sales expectations or numbers adjusted in light of the time spent planning

the Halloween party.  (Davidson Dep. 67, 80-91.)  Following the party, which took place sometime

shortly before Halloween, Plaintiff spent a small amount of time on follow-up details but her duties

relating to the party were largely over.  (Davidson Dep. 92-93.)

Plaintiff's first Performance Appraisal following her return to her position as a BDM,

completed by her supervisor May, noted areas where Plaintiff needed improvement.  (Defs.' Mot.

Ex. 5.)  In particular, the Performance Appraisal noted that Plaintiff needed to "get the funnel

overflowing" because Plaintiff was not even half way to her goal.  The Performance Appraisal also

noted that Plaintiff needed to "seek ways to improve upon the team dynamic both internal and

external," and to collaborate more effectively with both the internal and external team.   (*Id.*)

Plaintiff concedes that her funnel in this time period was below expectations but points out that she

had just started as a BDM a few months prior and had been required to spend a significant amount

of time planning the Halloween party, on which she received little help from her fellow employees.

(Davidson Dep. 67-76, 80-91, 79, 97.)  May was not receptive to these excuses, noting that Plaintiff

had spent two years in the Detroit market as a BDM and was expected to "hit the ground running"

when rehired one year later in to her old position.  (May Dep. 71.)

Following closely on the heels of this less than stellar Performance Appraisal, Plaintiff was

involved in a major confrontation with Allsteel's largest dealer, IE, when IE accused Plaintiff of

"flipping" a major customer, Federal Mogul, with a potential $1 million dollar deal, from IE to

Allsteel's other dealer in the Detroit market, CE.  After working with Plaintiff and IE for over a year

on the deal, the decision maker from Federal Mogul, Laurie Conn, sent an email to Plaintiff on

November 2, 2007 which notified Plaintiff that Federal Mogul wanted to switch the business from

IE to Allsteel's other dealer, CE.  (Defs.' Mot. Ex. 6.)  Although the email infers that Plaintiff might

be "shocked" by the request, in fact Plaintiff had lunched with Laurie Conn on October 29, 2007 at

which time Laurie had informed Plaintiff that Federal Mogul was thinking of switching from IE to

CE.  (Davidson Dep. 103-104, 113.)

Alsteel policy required Plaintiff to try to hold the IE deal with Federal Mogul together, and

to try to work out a resolution that kept the initial dealer involved, and to involve her supervisor to

facilitate a resolution.  Plaintiff concedes that she did not immediately notify either her supervisor,

May, or the principals at IE, Cojei and Balconi, that Conn was thinking of switching dealers.  (May

Dep. 117; Davidson Dep. 103, 109-112, 121-123.)  Plaintiff did have a conversation with Cojei,

encouraging him to pay more attention to Conn's needs, but never mentioned to him that Conn was contemplating switching to CE. (*Id.*) In addition, Plaintiff testified that after her lunch meeting with Conn, Plaintiff informed Conn that any decision to switch had to come solely from Conn and that Plaintiff could not be involved in facilitating the switch. (Davidson Dep. 108-109.) Nevertheless, in an email exchange dated November 2, 2007, Plaintiff coached Conn on the content of a Federal Mogul email intended to inform Allsteel of Federal Mogul's intent to switch to CE. In the email, Plaintiff says to Conn: "I just spoke with Rick [Allor of CE] and *we* would like to make a few suggestions about wording to add to your e-mail making it clear why CEBI is a better fit. *We* want to eliminate the option of my boss [May] asking for a meeting to change your mind." (Davidson Dep. 127) (Emphasis added).

Thus, Plaintiff was not only undermining IE's chances to retain the account, but even more significant to the instant case, her efforts to assist Federal Mogul to make the switch included her plotting to box-out her supervisor, May, from attempting to salvage the deal for Allsteel's largest dealer in Detroit. This indicates a clear rejection of her employment position as a member of the Allsteel team.

In the email, both Conn and Plaintiff indicate that they were "excited" about the switch and Plaintiff closes the email by saying: "Is it wrong to say woo hoo!!" (Davidson Dep. 126.) The Court concludes that "yes," it is wrong to say "woo hoo" with regard to Plaintiff's efforts, behind the back of May, to deep six IE in favor of her friend Rick Allor at CE. *See infra.* It was not until November 6, 2007, that Plaintiff finally informed May that Federal Mogul had decided to move the

6

business to CE.  (Davidson Dep. 135-136.)[1]

The following day, on November 7, 2007, Plaintiff and May, in a conference call with Cojei and Balconi, informed IE that Federal Mogul had decided to move the business to CE.  (May Dep. 135-136; Davidson Dep. 137-138.)  Plaintiff testified that Cojei and Balconi were very upset with her and accused her of giving IE's propriety information to CE.  (Davidson Dep. 141.)  Plaintiff testified that she tried to explain to them that the switch was entirely Conn's doing and that Conn had contacted Rick Allor on her own.  (*Id*.)  However, the November 2, 2007 "woo hoo" email exchange between Plaintiff and Conn establishes that Plaintiff had worked directly with Allor to "craft" the wording of the email from Conn to Cojei and Balconi informing them of the switch in a way that would forestall any effort by May to change Conn's mind.[2]

Cojei and Balconi were furious when informed of the switch.  (Defs.' Mot. Ex. 15, Affidavit

---

[1] The Court confirmed at the hearing on this matter that Defendants were aware of the "woo hoo" email chain before they terminated Plaintiff and that, in fact, it was this email that raised their suspicions about the integrity of Plaintiff's part in facilitating the switch.

[2] Although not relied on by the Court in its decision to grant Defendants' motion for summary judgment, the Court notes that subsequent to her termination, Plaintiff gave testimony in a deposition in another litigation matter indicating that she and Rick Allor had a prior professional relationship; Plaintiff had worked with Allor at one time and further Plaintiff had used him as a professional reference in her job search:

> Q: What was your relationship with Rick Allor?
> A: Professional.
> Q: How long had you known him before this happened with Federal Mogul?
> A: I knew him for a few years. He had, actually, been the sales manager at a dealership for my previous employer before coming to Allsteel.
>              *      *      *
> Q: You used him as a professional reference in your job search, didn't you?
> A: I might have.

(Deposition of Michelle Davidson, August 11, 2010 in *Vislosky v. Allsteel, Inc., et al*, No. 09-685781, Cuyahoga County Ct. Of Common Pleas, Civil Division, pp. 48-49.)

of Randy Balconi, ¶¶ 6-12.)  Plaintiff testified that Cojei and Balconi thought she had colluded with

CE to flip the business to CE and that Cojei "pounded his hand on the table and said, 'There had to

be consequences.'" Plaintiff then asked Cojei if he thought she should be fired. (Davidson Dep. 141-

146.)  Plaintiff testified that both Cojei and Balconi made it clear after the deal flipped that they no

longer trusted Plaintiff and did not want to do business with her.  (Davidson Dep. 144.)  Although

Plaintiff attempted to reconcile the issues with IE, she was never able to repair the relationship with

Cojei and Balconi.  (Davidson Dep. 153-156.)  Ultimately, Allsteel lost the Federal Mogul deal

altogether.  (May Dep. 121.)

Plaintiff testified that she had nothing to do with Conn's decision to go with CE, that Conn

did not like Steve Cojei personally and that May was not supportive of Plaintiff's efforts, following

the Federal Mogul decision to switch dealers, to reconcile her situation with Cojei and Balconi.

So, to recapitulate, Plaintiff had worked against May on a plan to harm IE, Allsteel's largest

dealer, in favor of her friend Rick Allor at CE, but now complains that May, who obviously smelled

something fishy (as did Cojei and Balconi), didn't facilitate her efforts to get back into the good

graces of Cojei and Balconi.   Plaintiff testified that May, who had heard Cojei and Balconi's rage,

prevented her from calling on Cojei and Balconi at IE, the largest dealer in the market, and at the

same time required her to maintain the same sales forecast, an impossibility from her perspective

without access to IE.  (Davidson Dep. 146-147, 153, 156-159.)  Plaintiff conceded however that

Cojei and Balconi were "very upset" with her and "didn't want [her] to come into their office."

(Davidson Dep. 159.)  May testified that he coached Plaintiff on repairing the relationship with IE

and encouraged her to speak with Cojei and Balconi to attempt to move the relationship forward.

May testified however, and Balconi confirms in his affidavit, that IE no longer trusted Plaintiff and

requested that Plaintiff not be permitted to work on the IE account.  (May Dep. 134-140; Balconi Aff. ¶ 11.)

On December 12, 2007, following the debacle with IE, Plaintiff was placed on a performance improvement plan ("PIP") by May, with the approval of Karen Huneycut in Human Resources, Malisa Bryant, Allsteel's Vice President of Sales, and Stephen Westog, May's boss.  (Defs' Mot. Ex. 7; Davidson Dep. 149; May Dep. 90-91; Westog Dep. 21; Defs.' Mot. Ex. 17, Pl.'s Resp. Ex. 21, Deposition of Karen Huneycut, March 30, 2010, pp. 94-95; Defs.' Mot. Ex. 14, Affidavit of Malisa Bryant, ¶ 3.)  Both Huneycut and Westog "were working very closely" with May on preparing Plaintiff's PIP, both were "aware of the issues with Michelle" and "all agree[d] that [Plaintiff] needed to be on a PIP."  Huneycut testified that "Steve [Westog] and I were a part of this all along."  (Huneycut Dep. 94-95.)  The PIP noted the following areas that Plaintiff needed to improve: performance and Sales Logix (her funnel, by her own admission, was below expectations), team attitude/activity (not being a team player and reportedly changing ownership of accounts from Pembroke to herself in the Sales Logix) and dealer partner relationships (jeopardizing the relationship with IE).  (May Dep. 62-70, 94-95, 98-99; Defs.' Mot. Ex. 7.)  May met with Plaintiff to discuss the PIP and Plaintiff was given a copy of the PIP to review.  Plaintiff states that May was abrasive during the meeting, that Plaintiff cried and that despite the fact that he was presenting her with a PIP, May told her there was nothing she could do to move forward.  (Davidson Dep. 149-152.)  Plaintiff concedes that prior to being presented with the PIP, she had been warned by May about her insufficient funnel and about the trust issues that she had created with IE.  (Davidson Dep. 151; Balconi Aff. ¶ 11.)

After reading the PIP, Plaintiff contacted Huneycut in Allsteel's human resources department

to complain about being placed on a PIP. (Davidson Dep. 162.) Plaintiff's version of this conversation differs from Huneycut's. Plaintiff testified that she told Huneycut that she was being "treated differently than [her] male counterpart," that she had been humiliated in public by May, that he would go out for drinks with her male counterparts and exclude her, that he gave her "extra duties" such as planning the Halloween party and that May didn't fairly examine the contents of Pembroke's funnel which, according to Plaintiff, was "all smoke and mirrors." (Davidson Dep. 162-173.) Huneycut testified that Plaintiff expressed concerns over "general management issues" and expressly denied that Plaintiff made any complaint of discrimination or raised any concerns that Huneycut felt needed to be investigated. (Huneycut Dep. 44-49, 54-72.) Huneycut testified that "there was no - no comment made about mistreatment based on gender. If there was, I would have jumped on it and done an investigation." (Huneycut Dep. 177.)

Plaintiff also testified that she "believed" she told Huneycut that there were other women, in particular she recalls mentioning Kathleen Vislosky and may have mentioned Maureen Malick, who had complained to Plaintiff that May had treated them differently from their male counterparts and held them to different standards than their male counterparts. (Davidson Dep. 174-182.) Plaintiff said it struck her that these women were experiencing the same things that Plaintiff was experiencing with May and testified that she had conversations with both women in which they compared experiences with May. (*Id.*) After Plaintiff was terminated, on August 4, 2008, Malick filed a complaint against May which was investigated by Huneycut. (May Dep. 45-50; Pls.' Resp. Ex. 9, Member Investigation Report on Complaint filed by Maureen Malick.) Huneycut interviewed both Malick and May and issued a report and recommendation, concluding that while there was evidence of some gender specific inappropriate language, there was no evidence of discrimination.

10

Malick's complaint had referenced both Plaintiff in this case and Vislosky as "causes for concern" but Huneycut's report found no evidence of discrimination with respect to either of those former Allsteel employees. (Pls.' Resp. Ex. 9, p. 15.) May was coached to stop using gender specific comments in the workplace but it was determined that his comments had not created a hostile work environment. (*Id.* at 16.) May and Huneycut described the coaching he received as a directive to use "more gender neutral comments," and to avoid phrases like "you guys," as well as to be more aware of spending an equal amount of time with each member of his team. (May Dep. 47; Huneycut Dep. 35.) Malick eventually left Allsteel of her own accord to work with a dealer. (Huneycut Dep. 30.)

Plaintiff also testified that she mentioned to Huneycut that Vislosky had commented that she had similar experiences working with May. Huneycut testified that the first time she became aware of Vislosky's complaints with regard to May was in late 2008 after Vislosky filed her lawsuit and long after Plaintiff had been terminated. Vislosky never complained of discrimination to Huneycut while she was employed by Allsteel and left Allsteel of her own accord. (Huneycut Dep. 43.) Vislosky sued Allsteel and May for gender discrimination in Ohio; Plaintiff Davidson testified on her behalf; a jury returned a unanimous verdict in favor of Allsteel and May. (May Dep. 50; Defs.' Reply 5 n. 3.)

As a result of the call from Plaintiff to Huneycut, Westog, May's boss, met with Plaintiff regarding the PIP, her performance and her relationship with May. Plaintiff testified, and Westog confirmed, that at no time during her meeting with Westog did Plaintiff mention any of the allegations of discrimination or of disparate treatment between herself and her male counterpart that she allegedly made to Huneycut. Plaintiff testified that she "assumed" Westog knew of her

11

complaints because he had spoken with Huneycut and she "chose not to elaborate on them." (Davidson Dep. 206-207; Westog Dep. 60-61.) Westog encouraged Plaintiff in the meeting to try to repair her relationship with IE and told Plaintiff to call him directly with any concerns she may have in the future. (Davidson Dep. 207-208.) Westog informed Plaintiff that she was no longer on the PIP but that there were certain expectations going forward, such as working on her relationship with IE. (Westog Dep. 58-60.) Westog testified that he was surprised when Plaintiff expressed to him her fear that Westog was going to fire her the day of the meeting and Westog explained to Plaintiff that people are placed on a PIP all the time. (Westog Dep. 60.) After Westog met with Plaintiff he met with Cojei and Balconi to say that Alsteel had no hard proof that Plaintiff had flipped the Federal Mogul deal and to reiterate that the company was supporting Plaintiff and to encourage them to try to work with her. (Westog Dep. 82-83.) They agreed to "give it a shot" and let Plaintiff bring in some opportunities but ultimately they continued to be disappointed with Plaintiff's attitude and never regained their trust in her. (Westog Dep. 84-85; Defs.' Mot. Ex. 15, Balconi Aff. ¶ 11.)

In the months that followed, Plaintiff testified that she worked to improve her performance and to repair the relationship with IE. On April 8, 2008, May sent Plaintiff an email, attaching the 2008 year to date numbers, which indicated that Plaintiff's funnel was $785,679 (compared to Pembroke's which was just over $5 million at that time). (Defs.' Mot. Ex. 9.) May informed Plaintiff in the email: "Your funnel needs immediate improvement it is not that different from December? Also, we agreed that you would be calling regularly to check in and keep me updated with activity, this has not been happening in recent weeks." (*Id.*) Plaintiff responded to this email, listing certain steps she had been taking to "fill the funnel" and admitting that she had not been in

contact as he requested and promising to touch base every week going forward. (*Id*.) On June 18, 2008, Plaintiff emailed a friend and admitted that her "furniture sales haven't been great the last 9 months, nobody is selling anything and my company has had a lot of layoffs." She expressed in the email that she had been told a "few times" that her job was in jeopardy and she was considering a move. (Defs.' Mot. Ex. 10.)

Plaintiff's 2007 Year End Performance Appraisal, which Plaintiff signed on March 15, 2008, indicated that Plaintiff needed improvement in multiple areas, specifically in her communications with team members and dealers, and several times referring to Plaintiff's below par performance relative to her team and her loss of the trust at IE, the largest dealer in the Detroit market. (Defs.' Mot. Ex. 8.) Plaintiff's funnel did grow to just over $2 million in June and opportunities were in her funnel that indicated IE as the dealer, indicating some improvement on Plaintiff's part. (Pl.'s Resp. Ex. 10; May Dep. 153-156; Huneycut Dep. 93; Westog Dep. 60.) According to May, however, although Plaintiff's funnel was starting to grow, it still was not where it needed to be, and IE was still refusing to work with Plaintiff. (May Dep. 155; Huneycut Dep. 164, 169; Westog Dep. 70-73; Defs.' Mot. Ex. 15, Balconi Aff. ¶ 11.)

Sometime in the middle of June, 2008, Plaintiff called Westog, as he had encouraged her to do, to complain that May was requiring her to report to him and to make a certain number of calls per week, requirements that Plaintiff alleged were not imposed on her teammate Pembroke. (Davidson Dep. 208-209; Westog Dep. 28-30.) Westog agreed that the numbers "might have been a little high" (May having required 10-13, Westog feeling that 7-8 was more realistic) and counseled Plaintiff that the key was to get the opportunities up and show some real activity. Westog did circle back with May on the issue and told him his numbers were slightly high and that May shouldn't "get

bogged down in the weeds" and should hold everyone to the same numbers and focus on activity rather than numbers of calls. (Westog Dep. 28-35.) Plaintiff again never mentioned to Westog any concerns about being treated differently because of her gender or being discriminated against because she was a woman. (Westog Dep. 28, 32.)

Huneycut testified that some time in late May, Westog and May came to her and indicated that while the situation with Plaintiff had improved slightly, it was "back to the same situation," with Plaintiff's performance "not there," and Plaintiff not responding to May. (Huneycut Dep. 115-116.) Huneycut asked for underlying documentation to support the termination request, which May began sending to her. (Huneycut Dep. 121-132.) Huneycut worked with May on preparing Plaintiff's termination papers. (Pls.' Resp. Exs. 14, 15.) May prepared a Performance Discussion Record ("PDR") which he sent to Huneycut for review. On June 12, 2008, Huneycut forwarded the PDR and backup documentation to Jim Lathrop, the Vice President of Allsteel's human resource department, with the following message: "This member was on PIP, and it expired. However, the productivity has not improved, the negativity has remained and our dealers refuse to work with her. Would like approval to terminate, based on attached." (*Id.*) Lathrop responded the next day, advising that the PDR needed be revised. On June 22, 2008, Huneycut sent a marked-up version of the PDR back to May with comments, questions and seeking further information and greater detail. (*Id.*) Huneycut testified that May addressed all of the concerns she raised "or [she] wouldn't have gotten the approval to terminate." (Huneycut Dep. 126.) The final termination document, which was approved by Lathrop and Bryant as well as by May and Westog, addressed Huneycut's suggested revisions and included the detail that Huneycut had indicated had been lacking in the earlier drafts. (Defs.' Mot. Ex. 11; Huneycut Dep. 133-134.) Huneycut testified that while she

14

suggested perhaps putting Plaintiff back on PIP, she "completely agreed" that Plaintiff "wasn't getting any better. She'd gotten a – kind of a free pass on the Federal Mogul thing before, and, to me, she needed to be terminated." (Huneycut Dep. 136.)

While Huneycut assisted in preparing the termination papers, Bryant, with the approval of Lathrop, made the final decision to terminate. On or about July 1, 2008, Bryant, Allsteel's Vice President of Sales, who had earlier approved placing Plaintiff on PIP, made the decision to terminate Plaintiff, effective July 2, 2008, for poor performance, inability to build and repair dealer relationships and disruptive behavior. (Defs.' Mot. Ex. 14, Bryant Aff. ¶¶ 2-4.) In her Affidavit, Bryant states that she contemplated terminating Plaintiff in November or December, 2007, based on the incident with Federal Mogul and the suspicious "woo hoo" email trail, but decided not to terminate at that time. (Bryant Aff. ¶¶ 6-7.) Bryant based her decision finally to terminate Plaintiff on her own observations, information from May and Westog, as well as information received from Allsteel's dealer partners in Detroit. Bryant had no knowledge, at the time she made the decision to terminate, that Plaintiff had made any complaints of any alleged sex discrimination or unfair treatment based on her gender. (Bryant Aff. ¶ 9.) On July 1, 2008, May and Plaintiff met, Huneycut participated by phone, and Plaintiff was informed that her employment was being terminated effective July 2, 2008. (Huneycut Dep. 155-157.) According to Huneycut, the conversation was "short and sweet." Per company routine, Plaintiff was not given a copy of the PDR but was informed of a couple of "bullet" issues that precipitated the termination, i.e. performance issues and the fact that Allsteel's largest customer would not deal with her any longer. (Huneycut Dep. 157, 163.) Plaintiff testified that she did not ask questions during the meeting, that she was "really upset" and "shocked," and followed up with Huneycut by phone about details of benefits and related

15

paperwork.  (Davidson Dep. 219-221.)

During the course of discovery, Allsteel uncovered documents, including emails and CAD drawings, that strongly indicated to Defendants that Plaintiff shared IE's confidential and proprietary information with CE in the course of flipping the deal from IE to CE.  Defendants maintain that this evidence is the "smoking gun" that they were looking for to confirm their suspicions, and IE's suspicions, that Plaintiff had been more instrumental in moving the deal from IE to CE than she admitted at the time.  Plaintiff had in her possession, on a flash drive that was produced in the course of discovery, CAD drawings (architectural design drawings specific to the Federal Mogul deal) with the CE logo on them which are dated November 14, 2007, just days after Plaintiff informed IE that Federal Mogul that was switching dealers from IE to CE.  The drawings were virtually identical to the design specifications that IE spent more than a year creating and the IE principals and Allsteel are of the opinion that CE could not possibly have generated the drawings from scratch in a matter of days. (Defs.' Br. 11, Ex. 15, Balconi Aff. ¶ 10.)  Plaintiff denies any wrongdoing, denies sending the IE typicals to CE and denies that she was instrumental in "flipping" the deal from IE to CE.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135,

17

145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III.    ANALYSIS

### A.    Plaintiff's Claim of Gender Discrimination under the ELCRA

Plaintiff claims that Defendants discriminated against her because she is a woman.  A Plaintiff may prove that she was subject to disparate treatment by producing either direct or circumstantial evidence of discrimination.  Plaintiff does not purport to have direct evidence of discrimination and therefore must proceed under the burden shifting framework applicable in cases of circumstantial evidence.[3]  By contrast to a case based on direct evidence, when a Plaintiff bases a discrimination claim on indirect evidence, which requires inference to reach the conclusion that the defendant discriminated against Plaintiff, the court applies the familiar *McDonnell Douglas*[4] burden-shifting framework.  Under this paradigm, Plaintiff must first proffer evidence from which a reasonable jury could conclude that she established a *prima facie* case of discrimination.  The Defendants must then offer admissible evidence of a legitimate, nondiscriminatory reason for their action. If Defendants do so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. Although the

---

[3]  "Under both Title VII and Michigan law, a plaintiff may set forth a prima facie case of employment discrimination by presenting direct evidence of the defendant's discriminatory intent. " *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002).  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.*  (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir.1999) (citations omitted).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

[4]  *McDonnell Douglas v. Green*, 411 U.S. 792, 802-805 (1973).

burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (internal citations omitted).

1.      **Plaintiff has failed to establish a *prima facie* case.**

To establish a prima facie case of discrimination under the ELCRA, a plaintiff must show that (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) that similarly situated individuals were treated differently and were not subject to the same adverse treatment. *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695 (1997). Defendants do not dispute that Plaintiff is a member of a protected class or that her termination constituted an adverse employment action.[5] Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination because she was not qualified for her position and because she cannot identify similarly situated employees who were treated differently.

a.      **Plaintiff has created a genuine issue of fact as to her qualification for the BDM position.**

Plaintiff, who worked for Allsteel as a BDM in the Detroit market from 2004 to 2006 and was rehired to that same position in 2007, possessed the functional qualifications to perform her job at the time she was repositioned in 2007. In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564,

---

[5] It is unclear from Plaintiff's response whether she alleges that placing her on PIP qualified as an adverse employment action. *See* Pl.'s Resp. 1. The Court concludes, in any event, that placing Plaintiff on PIP was not an adverse employment action based on the facts of this case. *See Bacon v. Honda of America Mfg. Inc.*, 192 F. App'x 337, 2006 WL 1973242, at * 5 (6th Cir. 2006) (unpublished) (noting that PIPs "do not, on their own, generally qualify as employment actions")(citing *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) and *Primes v. Reno.*, 190 F.3d 765, 767 (6th Cir. 1999)).

575-576 (6th Cir. 2003), the court explained that a plaintiff's *prima facie* burden on the issue of qualification is met by "presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  By focusing on the objective criteria of qualification at the *prima facie* stage, the court meant to preclude consideration of the employer's alleged nondiscriminatory reason for taking the adverse employment action. *Id*. at 574-575.  "In an effort to ensure that the first two stages of the *McDonnell Douglas* inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, *Cline* requires that the "qualified" prong of the *prima facie* case be evaluated in light of the plaintiff's employment record 'prior to the onset of the events that the employer cites as its reason' for its decision." *Hoffman v. Sebro Plastics, Inc.*, 108 F. Supp. 2d 757, 772 (E.D. Mich. 2000) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 6620-663 (6th Cir. 2000)).

Thus, the *prima facie* burden to establish qualification is satisfied by credible evidence that Plaintiff continued to possess the same objective qualifications that she held when she was hired. *Wexler*, 317 F.3d at 575.  There is no evidence that Plaintiff lacked the objective minimum criteria as to training, education or skill to perform her job as a BDM.  The fact that Defendants reassigned Plaintiff to this same position is solid evidence that she was objectively qualified as to these basic criteria.

Defendants urge the Court to conclude, however,  that Plaintiff's conduct in allegedly flipping the Federal Mogul deal rendered her untrustworthy and therefore objectively unqualified

to perform her job.  In support of this position, Defendants rely on the "smoking gun" evidence,

acquired after Plaintiff's termination, which they argue confirms unequivocally that Plaintiff shared

IE's confidential and propriety information with CE, that she was responsible for "flipping" the

Federal Mogul deal and that she failed to disclose this information to Defendants.  Defendants argue

that had they possessed this "smoking gun" evidence at the time they terminated Plaintiff, they

would have terminated her on this basis alone.[6]   They argue that this evidence demonstrates that

Plaintiff was objectively unqualified for the position at the time of her termination because she

lacked the basic job requirements of honest and integrity.   Plaintiff responds that she was not

responsible for "flipping" the Federal Mogul deal, that she did not share IE's confidential or

proprietary information and that she did not facilitate or lie about Conn's decision to switch dealers.


On these points, the Court concludes, there is a clear question of fact.  In this respect, the

instant case differs from *Serrano v. Cintas Corp*., No. 04-40132, 2008 WL 4539339 (E.D. Mich.

Oct. 7, 2008) (unpublished) in which Judge Cox adopted the Report and Recommendation issued

by Magistrate Judge Scheer recommending that the court grant defendant Cintas' motion for

summary judgment as to plaintiff Anthony Jones.  Defendants urge the Court to consider Magistrate

---

[6] The Court agrees with Defendants that *McKennon v. Nashville Banner Publishing Co*., 513 U.S.
352 (1995) is inapposite because the employer in that case admitted that plaintiff's termination had
been based on unlawful discrimination and attempted to use the after-acquired evidence, which
would have led to lawful termination, to deny plaintiff any right to relief for the earlier violation.
513 U.S. at 356 (rejecting the conclusion reached by the district court and court of appeals that
"after-acquired evidence of wrongdoing which would have resulted in discharge bars employees
from any relief under the ADEA").   Defendants in the instant case do not concede unlawful
discrimination and do not purport to rely on after-acquired evidence to justify their earlier decision
to terminate Plaintiff.  They proffer the after-acquired evidence to establish that Plaintiff was not
qualified for her position at the time of her termination.

Judge Scheer's ruling in *Serrano* that "basic honesty is an objective qualification for any legitimate position of employment" and to conclude that Plaintiff's lack of honesty and integrity in flipping the Federal Mogul deal rendered her objectively unqualified for her position. *Serrano* is inapposite. In that case, the court concluded that plaintiff failed to rebut Cintas' legitimate, non-discriminatory reason for refusing to hire plaintiff based on four different interviews of plaintiff conducted by Cintas employees. *Id.* at *3. The court also agreed with Magistrate Judge Scheer's conclusion that the plaintiff failed to establish a *prima facie* case because "it was certain" that plaintiff had extensively misrepresented his prior educational and work history on his employment application, and therefore was objectively unqualified for the job. *Id.* Although the information confirming that plaintiff had lied extensively on his employment application was only discovered in the course of the litigation, after plaintiff's termination, Magistrate Judge Scheer had reasoned that no reasonable jury could infer, based on plaintiff's admission that he had extensively misrepresented his employment and educational experience, that plaintiff met Cintas' basic requirements of honesty and integrity at the time Cintas rejected his application for employment. *Id*. at *10. Magistrate Judge Scheer concluded that this undisputed "fraud" objectively disqualified him from the position, regardless of whether Cintas knew the extent of plaintiff's misrepresentations at the time that they declined to hire him. *Id*. at * 11-12.

In the instant case, although there is no question that Allsteel and IE both legitimately and honestly believed at the time Plaintiff was terminated, based on the "woo hoo" email and other objective facts, that Plaintiff had been deceitful in moving the Federal Mogul deal to CE, Plaintiff continues to dispute that she engaged in any wrongdoing. Therefore, the Court cannot conclude as a matter of law, as Judge Cox did in *Serrano*, that it is "certain" that Plaintiff engaged in behavior

22

that "objectively disqualified" her from her position. On the facts of this case, use of this after acquired evidence in support of the argument that Plaintiff was objectively unqualified for her position invites precisely the type of subjective inference that *Wexler* forbids at the *prima facie* stage. The Court concludes that Plaintiff has proffered sufficient evidence that she was objectively qualified by her education and her skills to perform the functions of a BDM to raise a genuine issue of fact as to Plaintiff's qualification for her position.

> **b.    Plaintiff has failed to produce evidence that a similarly situated employee was treated more favorably.**

Plaintiff claims that her team partner, Dan Pembroke, was treated more favorably by May than she because he was not questioned about or reprimanded for his funnel, which Plaintiff claimed was all "smoke and mirrors." To create an inference of disparate treatment, Plaintiff must establish that Pembroke and Plaintiff were similarly situated. To establish that the two were similarly situated, Plaintiff must demonstrate that "all relevant aspects of [her] employment situation were nearly identical to those of [Pembroke's] employment situation." *Town*, 455 Mich. at 699-700. This Plaintiff cannot do because the indisputable evidence is that Plaintiff's funnel was far below expectations, Pembroke's funnel was double to triple Plaintiff's funnel and neither Allsteel dealer in the Detroit market had refused to work with Pembroke or expressed any concerns regarding his integrity or trustworthiness. In order to make her "similarly situated" claim, Plaintiff would have to demonstrate that an employee with similar performance deficiencies was treated more favorably.

The court in *Town* made this same observation in concluding that plaintiff's replacement, Lawrence, was not similarly situated to plaintiff (McConnell): "The most significant distinction between the two employees, however, is that McConnell failed to generate enough sales to cover his own salary, while Lawrence generated sales equivalent to nearly 2.3 times her salary in the first

23

year. Thus Lawrence was not similarly situated to McConnell because her performance was proportionately higher. A more apt comparison would have been for McConnell to compare himself to another employee who failed to generate enough sales to cover his salary, but was retained." 455 Mich. at 700. Thus, Plaintiff's comparison to Pembroke might be apt if Pembroke had lost the trust of the biggest dealer in Detroit and otherwise demonstrated the same performance deficiencies as Plaintiff at the time Plaintiff was terminated. Plaintiff has proffered no such evidence.[7] *See also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) ("'The individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it.'") (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992)). Like the plaintiff in *Majewski,* Plaintiff in the instant case has produced no evidence that Pembroke was "similarly situated with respect to the severity and frequency of their performance errors." 274 F.3d at 1116. There simply is no evidence that Pembroke engaged in any of the same conduct as Plaintiff. Not only was Pembroke's funnel demonstrably higher than Plaintiff's but there is no evidence that he had lost the trust of his employer's largest account.

---

[7] Plaintiff complains that Pembroke's funnel was "all smoke and mirrors," implying that his performance deficiencies were greater than he represented to his employer. Notably, Pembroke was also terminated for unsatisfactory performance following Plaintiff's discharge. (Huneycut Dep. 160; Westog Dep. 36-37.) Regardless of the fact that Pembroke was subsequently terminated for performance related issues, or that Plaintiff believed his funnel to have been exaggerated, there is no dispute that Pembroke's funnel was significantly greater than Plaintiff's at the time of her termination and there is no evidence to suggest that Defendants did not possess "an honest belief" that Plaintiff's funnel was unacceptably below expectation. *See infra* discussion of pretext at pp. 25 to 28. In any event, Plaintiff's undisputed significant problems with Allsteel's largest dealer would be enough, standing alone, to differentiate her from Pembroke on her "similarly situated" claim.

24

Moreover, Pembroke was in fact treated the same as Plaintiff in that he was terminated shortly after Plaintiff for performance related issues.  (Huneycut Dep. 160; Westog Dep. 36-37.)  Pembroke, unlike Plaintiff, was never given the opportunity to redeem himself with a PIP.  (Huneycut Dep. 161-162; Westog Dep. 36-37.)  The Court concludes that Plaintiff has failed to establish this critical element of her *prima facie* case and her discrimination claim fails for this reason.

### 2.  Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff cannot establish pretext.

Even assuming Plaintiff could establish a *prima facie* case of discrimination, Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's termination.  Defendants terminated Plaintiff because of poor performance, losing the trust if IE and being unable to repair that relationship and for being disruptive to the sales and dealer teams.  These are the same issues that were noted as Defendants' basis for putting Plaintiff on a PIP months before her termination.  Defendants having proffered such a legitimate basis, the burden shifts back to Plaintiff to show that a genuine issue of fact exists as to whether Defendants' reason was in reality a pretext for discrimination.  *Majewski*, 274 F.3d at 1116.  "To prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that the plaintiff's [gender] was a motivating factor in the employer's decision." *Town*, 455 Mich. at 697.

The Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for terminating an employee.  "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.  An employer has an honest belief in its reason for discharging an employee where the employer

25

reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117. Thus, the fact that an employee may disagree with an employer's assertions about her performance, or may think that her alleged errors were blown out of proportion, such disagreement with the employer's honest business judgment at the time of the adverse action does not create sufficient evidence of pretext in the face of "substantial evidence that [the employer] had a reasonable basis to be dissatisfied." *Id.* at 1116.

There is ample evidence that Defendants had substantial basis to be dissatisfied with Plaintiff. Her funnel, by her own admission, was one-half to one-third its target. She admitted to a friend that her furniture sales were "not great" in the nine months preceding her termination and that she feared she might be terminated. Plaintiff complains that Defendants' allegations about her funnel were unfounded because her partner's funnel "was all smoke and mirrors" and that this was substantiated by Defendants' subsequent termination of her partner. However, the fact that Defendants may subsequently have concluded that Pembroke's performance was also deficient does not alter the fact that Defendants justifiably relied on the "particularized" facts before them in making their "reasonably informed and considered decision" to terminate Plaintiff. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

More important, and dispositive in this case, is the undisputed fact that Plaintiff had lost the trust and respect of Allsteel's biggest dealer, IE, who provided affidavit testimony expressing their opinion that Plaintiff had been responsible for moving business away from IE to another dealer, their belief that Plaintiff lacked honesty and integrity and their intention not to work with Plaintiff in the future. Defendants were not required to "leave no stone unturned" in reaching their conclusion that Plaintiff should be terminated. *Id.* (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)).

Plaintiff's unsubstantiated assertion that the stated reasons for her termination were either false or exaggerated is "insufficient to call into question [Defendants'] honest belief" in the particularized facts supporting the decision to terminate Plaintiff. *Majewski*, 274 F.2d at 1117. *See also Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66 (6th Cir. 1992) (upholding summary judgment where plaintiff presented only personal conclusions to rebut defendant's legitimate nondiscriminatory reasons for adverse action).

Plaintiff relies on *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) and *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004) to argue that an inference of discrimination should nonetheless be inferred based upon a "corporate culture of discrimination against women at Allsteel and May's pattern or practice of discrimination against the female BDMs reporting to him." (Pl.'s Resp. 17.) But these cases are inapt. Both deal with evidence of company-wide discriminatory behavior, discriminatory animus which permeates an institution and is evidenced by discriminatory conduct at the highest levels of management. *Ercegovich* speaks of proof of "[d]iscriminatory statements [that] may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time." 154 F.3d at 356. Similarly, *Bacon* discusses the pattern-or-practice method of proving discrimination, noting first that it is unavailable as a method of proof to an individual plaintiff and is reserved for class actions or suits by the government. Even if such evidence should be considered in the case of an individual claimant, it must constitute admissible evidence that "a company had a policy of discriminating against a protected class."[8] 370 F.3d at 575. Plaintiff has produced

---

[8]As further alleged evidence of the corporate culture of discrimination, Plaintiff offers an email from an Allsteel dealer in Pittsburgh to Eugene Sung at Allsteel expressing the dealer's opinion, based on conduct allegedly observed at a meeting which included the dealer's wife, that May "might have

absolutely no evidence of any company-wide or "managerial level policy hostile to [women]" at Allsteel. 154 F.3d at 358. Plaintiff's argument on the issue of pattern-or-practice revolves solely around the conduct of May. Even if true, such allegations as to one rogue employee do not a pattern or corporate culture make. Indeed, other than Huneycut, none of the five individuals involved in approving Plaintiff's termination are even alleged to have known of her complaints of discriminatory animus and two of them, including the ultimate decision maker, were women. Moreover, neither Vislosky nor Malick, the two employees whose treatment Plaintiff claims evidences the "corporate culture" of discrimination, was fired. Both quit. Additionally, as to Allsteel's internal investigation of Malick's claims, the conclusion was that there had been no discrimination by May. As to Vislosky's claims, a jury returned a unanimous verdict in favor of Allsteel and May. Even if the Court were to determine that these other women's claims were somehow relevant to Plaintiff's claims against May, neither involved any adverse discriminatory action on the part of Defendants and given their ultimate resolutions, their probative value would be far outweighed by their prejudicial effect.

Also significant in assessing this third stage of the *McDonnell Douglas* framework is consideration of any inference to be drawn from the fact that the same individuals both hired and fired the plaintiff. "The relevance of the fact that the employee was hired and fired by the same

---

a problem with females." (Pl.'s Resp. Ex. 16.) First, this letter is hearsay on multiple levels, as to which Plaintiff has offered no basis for an exception. Second, the letter says nothing about the conduct or beliefs of anyone at Allsteel other than May and certainly cannot be read to support an argument that there was "a corporate culture" of discrimination against women at Allsteel. Plaintiff also alleges that Rick Allor, from CE, told Plaintiff that May did not like women and further told Plaintiff that May had told Allor that he wanted to get rid of Vislosky so he could have an all male team. Again, this is rank hearsay without a basis for exception. Notably, Plaintiff neither deposed Mr. Allor nor obtained his affidavit in support of her claims regarding May's conduct toward women.

28

person within a relatively short time span comes at the third stage of the analysis. To reiterate in only slightly different terms what has previously been discussed, this fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual."*Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Defendants argue, and the Court concludes persuasively, that Defendants are entitled in this case to a "same actor" inference to support their argument that Plaintiff was not terminated based on unlawful gender-based animus. The "same actor" inference recognizes that "in cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Town*, 455 Mich. at 700. *See also Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461, 464 (6th Cir. 1995) (noting that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class.") It is undisputed that May, Westog, Bryant and Huneycut were involved in the decision to reposition Plaintiff as a BDM in the Detroit market, and indeed to compensate her at her higher corporate accounts salary. Plaintiff concedes that May also welcomed her on to his team without reservation. Under these facts, Defendants are entitled to a "same actor" inference.

The Court concludes, viewing the facts in the light most favorable to the Plaintiff, that Plaintiff has failed to proffer admissible evidence which creates a genuine issue of fact as to whether Defendants' legitimate, non-discriminatory reasons for terminating Plaintiff were a mere pretext for discrimination. The Court concludes that no reasonable juror could find pretext on the basis of the evidence proffered.

**B.    Plaintiff's Claim of Retaliation Under the ELCRA**

29

1.      **Plaintiff has not established a *prima facie* case of retaliation.**

To establish a *prima facie* case of retaliation under the ELCRA, Plaintiff must show: (1) that she engaged in protected activity; (2) that this was known by the Defendants; (3) that the Defendants took an employment action adverse to the Plaintiff; and (4) that there was a causal connection between the protected activity and the adverse action. *Barrett v. Kirtland Community College,* 245 Mich. App. 306, 315 (2001) (citing *Meyer v. Center Line*, 242 Mich. App. 560, 568-569 (2000) citing *DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 436 (1997)). The ELCRA defines the type of activity protected under the act and prohibits retaliation or discrimination because "the person has opposed a violation of this act, or because the person has made a charge . . . under this act." Mich. Comp. Laws § 37.2701(a). To constitute a "charge" under the act, an employee need not specifically mention the act but "must do more than generally assert unfair treatment." *Barrett*, 245 Mich. App. at 318-319. "The employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA." *Id.* at 319.

"To establish causation, the plaintiff must show that [her] participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." 254 Mich. App. at 315 (citing *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999)). "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action. Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was

30

taken shortly after the plaintiff's exercise of protected rights is relevant to causation.  In addition, the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met."  *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999).

Defendants argue that Plaintiff cannot establish the second prong of the *prima facie* case of retaliation because neither Westog, May, Lathrop nor Bryant knew that Plaintiff had complained regarding any alleged protected activity before they made the decision to terminate her.  While it is true that each of these individuals denies having had knowledge of Plaintiff's alleged complaints to Huneycut, and while Huneycut herself denies that Plaintiff made complaints of gender discrimination to Huneycut, Plaintiff's testimony is otherwise.  Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that there is sufficient evidence to create a genuine issue of fact that at least Huneycut, and perhaps Westog, knew that Plaintiff was claiming that May treated her dissimilarly from her male counterpart and that the differential treatment was based on Plaintiff's gender.  For example, in her deposition, Plaintiff testified as follows regarding her first telephone call to Huneycut:

> Q: Do you recall what you told Karen:
>
> A: Yes. I told her that I was being held to different standards than my male counterpart.
>
> ***
>
> I told her a lot of examples of this type of thing where I felt like I - I was being constantly harassed about not having enough in the funnel and my counterparts were wined and dined and met with separately and given all the coaching and support they needed, even though they weren't really working the opportunities that were in Sales Logix.
>
> ***
>
> I asked [Karen] for help, that I loved my job, I wanted to continue to work there, but this was an unfair working environment.
>
> ***
>
> Q: You said you were being treated differently, that's what you told her?

31

A: Yes, I'm being treated differently, I'm being held to different standards, it's a hostile working environment, he's constantly harassing me and swearing at me and humiliating me in public.  I told her I cried at the restaurant.

Q: So, backing up, you didn't use those words, "male counterpart"?

A: Yes, I did.

***

The next day while we were still there, we were going to meet in the morning as a group, and [May] said, "Michelle, make sure you bring pen and paper to take notes." I was the only person he asked to take notes. At the time, again I thought, well, that's a little odd, you know, but I indicated to Karen [Huneycut] that looking back on things, I felt it was indicative of how he felt about me. I didn't realize it at first.

I had also had a conversation, because I was just coming to his team from corporate accounts, I had had a conversation with one of my male counterparts on the corporate accounts team and said, "What do you make of these kind of comments? It seems like it's really old school to me, like old-fashioned. What is this?" And I had that conversation with Karen.

I think I also mentioned to her that other women [Vislosky in particular] had complained - who report to Jamie had complained to me about some of the same issues that I was starting to go through now, they had told me about them previously, but - and that I was starting to see a lot of the same behaviors that they had described to me.

(Davidson Dep. 162-164, 165-166, 173-174.)  Although this is not the strongest statement of a claim of gender discrimination the Court can imagine, it is enough, given the burden at the *prima facie* stage of proof, to establish that at least some of the individuals involved in terminating Plaintiff had knowledge that Plaintiff was claiming that she was being treated differently than her male co-worker because she was female.

The more pertinent question in the instant case is whether Plaintiff was engaged in protected activity, either making a charge or opposing unlawful conduct, as defined under the ELCRA, when

32

she allegedly made these comments to Huneycut.[9]  When making a charge under the act, an employee "must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA."  *Barrett*, 245 Mich. at 319.   When opposing alleged discriminatory conduct, "[a]n employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination. In our view, such would constitute an intolerable intrusion into the workplace." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989).  Merely invoking the buzz words "harassment" or "hostile work environment" is not sufficient to invoke the protections of the act.  "[T]he mentioning of the word 'harassment' alone or the phrase 'hostile environment' in the letters was insufficient to give Ford notice that sexual harassment was being claimed." *Elezovic v. Ford Motor Co*., 472 Mich. 408, 428 (2005).

Even viewing the facts in the light most favorable to Plaintiff, and assuming that she made the comments to Huneycut that she claims in her deposition to have made, these comments about "old-school" and "old-fashioned" conduct on the part of May, and charges that May asked Plaintiff but not Pembroke to take notes, are just the type of vague charges that are insufficient to invoke the protections of the ELCRA.  *See Booker*, 879 F.2d at 1313 (holding that a memo written to human

---

[9] "As the Sixth Circuit observed in *Booker*, 'The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings.'" *Hoffman*, 108 F. Supp. 2d at 775 (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir.1989)).  While Defendants do not discuss the distinction, Plaintiff's claim is most appropriately categorized as opposition activity.

resources that charged that plaintiff's supervisor was "racist" based on a particular comment that he had made and claimed that the charges against his performance were the result of "ethnocism" (which the court read to mean discrimination), were insufficient to constitute opposition under the ELCRA). The Court concludes, even viewing the facts in the light most favorable to the Plaintiff, that Plaintiff's alleged comments to Huneycut did not constitute protected activity as that term is understood in the ELCRA.

Even assuming that Plaintiff could establish the first three prongs of a *prima facie* claim of retaliation, Plaintiff would still have to establish that her complaints to Huneycut were a "significant factor" in the decision to terminate her and she would be required to proffer "evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen*, 165 F.3d at 413. "The *significant factor* standard 'requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Hoffman*, 108 F. Supp. 2d at 775 n. 19 (citing *Booker*, 879 F.2d at 1310) (emphasis in original).

"[E]vidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Allen*, 165 F.3d at 413. First, the Court has already concluded that Plaintiff has not created a genuine issue of fact that similarly situated individuals were treated differently. With regard to the timing of Plaintiff's termination, Plaintiff complained to Huneycut in December 2007 and was terminated seven months later, in July 2008. Although Plaintiff argues that she was terminated "two weeks" after her last discussion with Westog, there is no allegation that any claims of unlawful discriminatory behavior on the part of May were made in that conversation.

34

Much transpired in the months between December 2007 and July 2008 to confirm Defendants' legitimate concerns about Plaintiff's performance and problems with IE, both of which were the subject of her PIP.

There is no evidence that Bryant or Lathrop, the ultimate decisionmakers on Plaintiff's termination, had any indication whatsoever that Plaintiff had complained about discriminatory treatment at any time and no evidence that her conversation with Huneycut was in any way a factor in their decision to terminate Plaintiff.  Plaintiff was facing significant criticism regarding her job performance and relationship with IE before she approached Huneycut and there is absolutely no evidence to support a contention that her conversation with Huneycut, or subsequent conversations with Westog, were a significant factor in the ultimate decision to terminate her.  Although the burden of establishing a *prima facie* case of retaliation is not high, it cannot be met with such vague, unsupported charges of retaliatory behavior.

### 2. Defendants' have proffered legitimate, non-discriminatory reasons for termination and Plaintiff has not demonstrated evidence of pretext.

"The *McDonnell Douglas* burden shifting paradigm applicable in disparate treatment discrimination cases is applicable to retaliation claims, as well." *Hoffman*, 108 F. Supp. 2d at 777. (citing *Zanders v. National R.R. Passenger Corp*., 898 F.2d 1127, 1134 (6th Cir. 1990)).  Defendants here proffer the same evidence to rebut Plaintiff's retaliation claim as they did to rebut Plaintiff's discrimination claim. The Court finds that Plaintiff has not produced sufficient evidence to establish an issue of fact as to whether Defendants' proffered reasons were pretextual.  Even assuming, therefore, that Plaintiff could establish a *prima facie* claim of retaliation, Plaintiff has failed to produce evidence sufficient to rebut Defendants' evidence of its legitimate, non-discriminatory reasons for terminating Plaintiff.

35

### C.     Plaintiff's Claim Against May Individually

The Michigan Supreme Court has held that under limited circumstances, an individual supervisor may be liable under the ELCRA. *Elezovic*, *supra,* 472 Mich. at 425-426. Plaintiff claims that May is individually liable because he "played a meaningful role in the decision to terminate." (Pl.'s Resp. 19.) Plaintiff does not contend that May was the ultimate decision maker in Plaintiff's termination but asserts that May should be held individually liable because he participated in that decision. Plaintiff quotes from *Ercegovich*, in support of her argument that all she need demonstrate in order to establish individual liability is that May "played a meaningful role in the decision to terminate." (Pl.'s Resp. 19) (quoting *Ercegovich*, 154 F.3d at 354-55). However, the court in *Ercegovich* was not addressing the issue of individual liability under ELCRA. In fact, no individuals were sued in *Ercegovich* and no claim of individual liability was asserted. In the language quoted by Plaintiff, the court was analyzing the strength of plaintiff's *prima facie* case and specifically discussing the relevance of remarks made by non-decisionmakers to a finding of discriminatory intent.

Plaintiff provides the Court with no cogent argument, and no authority, to support a conclusion that May should be held individually liable on Plaintiff's discrimination and retaliation claims when the Court has concluded that those claims fail as a matter of law. *See Ford v. Lowe's Home Center, Inc.*, No. 07-13303, 2008 WL 5273607 at * 9 (E.D. Mich. Oct. 31, 2008) (recognizing that even if plaintiff could state a claim for individual liability on her discriminatory discharge and retaliation claims, because those claims failed for other reasons, the issue of individual liability was "a moot point"). Because the Court concludes that there is insufficient evidence to support Plaintiff's claim that her termination was unlawful, Plaintiff's claims against May for his

36

participation in that decision similarly must fail.

## IV.    CONCLUSION

Plaintiff has failed to establish either a *prima facie* case of discrimination or retaliation and, even assuming a *prima facie* case could be made, Plaintiff has failed to rebut Defendants' legitimate, non-discriminatory reasons for terminating her employment.  The Court GRANTS Defendants' motion for summary judgment and DISMISSES Plaintiff's Complaint.

**IT IS SO ORDERED.**


S/Paul D. Borman _____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 22, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 22, 2011.


S/Denise Goodine _____
Case Manager